**Darrell Wayne COPPAGE, Plaintiff,**

v.

**Jatinder P.S. MANN, et al., Defendants.**

**Civ. A. No. 95–208–A.**

United States District Court,
E.D. Virginia,
Alexandria Division.

Nov. 7, 1995.

---

Victor M. Glasberg, Jeanne Goldberg, Victor M. Glasberg & Associates, Alexandria, Virginia, Jonathan M. Shapiro, Michael W. Lieberman, Jonathan Shapiro & Associates, P.C., Alexandria, Virginia, for Plaintiff.

Robert S. Corish, John J. Brandt, Slenker, Brandt, Jennings & Johnston, Merrifield, Virginia, Brewster Rawls, John B. Nicholson, Spotts, Smith, Fain & Rawls, Richmond, Virginia, Henry E. Hudson, Mary Zinsner, Mays & Valentine, Alexandria, Virginia, for Defendants.

## MEMORANDUM OPINION

ELLIS, District Judge.

Plaintiff, a former Virginia prison inmate, here asserts federal and state causes of action against various state prison employees and contractors for injuries growing out of defendants' alleged failure to discover and treat plaintiff's spinal cancer. More specifically, plaintiff asserts that defendants or various of them violated his Eighth Amendment rights (i) by failing to diagnose and treat his cancer, (ii) by subjecting him to inhumane living conditions, and (iii) by handcuffing him to his bed. Also asserted by plaintiff against various defendants are state claims for medical malpractice, assault and battery, and intentional infliction of emotional distress. Before the Court now are motions for summary judgment from each of the four remaining defendants.

### I[1]

The dramatis personae in this matter is not extensive. From January 3, 1994 until September 15, 1994, plaintiff Darrell Wayne Coppage was a prison inmate at Rappahannock Security Center ("RSC") serving a sentence for grand larceny. During his incarceration at RSC, Coppage suffered from an undiagnosed cancerous tumor at the base of his spine, causing him partial paralysis and incontinence. It is defendants' response to

---

1. In large measure, the facts set out in this section of the opinion are not in dispute. Where there is a dispute, the differing versions are identified. Of course, in considering whether to grant defendants' motions for summary judgment, plaintiff's version of the facts must be accepted as true. *Matsushita Elec. Indus. Co. v.*

Coppage's physical problems that is the focus of this case.

During all times relevant here, defendant Morton Leibowitz was RSC's Superintendent and defendant Diane Purks, a nurse, was RSC's Medical Supervisor. Defendant Jatinder Mann was the contract physician for RSC who saw patients there two days a week. Finally, defendant Richard Ranels was a neurologist in the nearby town of Fredericksburg who examined Coppage at Dr. Mann's request.[2]

When Coppage was initially received at RSC on January 3, he was asked to provide a medical history. In response, he disclosed that he had been treated at Mary Washington Hospital in Fredericksburg for shoulder pain, a slipped disk, and a pinched nerve. He did not reveal that he had sought treatment at the Mary Washington Emergency Room on seventeen occasions over the course of three years. On those occasions, he had complained of a variety of ailments, including abdominal pain, lower back pain, burning in the chest and kidneys, arm numbness, pus-like penial discharge, back pain for two weeks that extended into the scrotum, pain in his testicles, problems voiding for several months, numbness in his left leg from his hip to his foot, shoulder pain and a tearing sensation in his back, and sharp pain in his left leg with numbness causing a doctor to recommend a bone scan if the problems continued. None of this was disclosed to defendants.

On January 5, two days after entering RSC, Coppage complained of pain in his hip and chest. As a result, he saw one of the jail nurses, Sylvia Fortune, who scheduled an examination with Dr. Mann for January 7. In the meantime, she gave him Sudafed and Tylenol to ease the pain. During the January 7 exam, Coppage told Dr. Mann that he had been experiencing pain in his left hip and lower back for the past seven months. He denied any numbness in those areas and again did not tell Dr. Mann of his extensive prior treatment at Mary Washington Hospi-

tal. Dr. Mann diagnosed Coppage's pain as muscle strain and prescribed Motrin.

During the next six months, Coppage was a prodigious user of RSC's medical services. He saw Dr. Mann nineteen times and other medical personnel thirty-five times, complaining at various times of chest, knee, back, leg, hip and testicle pain, numbness in arm, a burning sensation while urinating, shortness of breath, numbness in back and stomach after exercising, and blood in his stool. In Coppage's own words, "I seen (sic) the doctor as much as possible." During this period, symptoms seemed to be sporadic. Thus, although Coppage would at times complain of incapacitating leg or back pain, he would then be seen exercising or playing basketball. Examinations performed during that time revealed no objective basis for the symptoms. As a consequence, Dr. Mann became increasingly suspicious that Coppage's complaints were not genuine.

On April 23, Coppage fell in his cell, struck his head, and claimed to be numb from the waist down. He was immediately taken by ambulance to Mary Washington Hospital, some ten miles from RSC. Once there, he was examined and x-rays of his back were taken. The x-rays were normal and the examining physician found no apparent injuries. Coppage was then returned to RSC, where it was noted that he was able to walk from the vehicle back into RSC. Coppage's hospital discharge summary noted that he should return immediately if he experienced incontinence or numbness in his legs.

From late April until July, nothing of consequence apparently occurred. Then, on July 10, Coppage complained to Nurse Roberts of muscle spasms, difficulty moving, and severe back pain near his spine. In response, she massaged his back, applied hot towel compresses, gave him Motrin, and showed him how to lie to relieve pressure on his spine. The next day, Coppage collapsed in his cell and was brought to the RSC medical office by stretcher. There, he told Nurse Purks that he had sharp pains in his

---

*Zenith Radio Corp.*, 475 U.S. 574, 587–88, 106 S.Ct. 1348, 1356–57, 89 L.Ed.2d 538 (1986).

**2.** Captain James B. Smith, Chief of Security at RSC, was originally named as a defendant in this action, but was subsequently dismissed with prej-

udice pursuant to Rule 41(a)(1)(ii), Fed.R.Civ.P. Also, plaintiff's mother was originally a plaintiff in this action, but her claims were presumably withdrawn, as they were omitted from the Amended Complaint.

lower back, that he was numb from the waist down, and that he could not walk. Her observations contradicted his complaints. Thus, Nurse Purks noted that Coppage was able to turn his legs from side to side, sit up on his own, and swing his legs over the side of the stretcher, movement that was inconsistent with paralysis. In any event, he was placed in a special cell near the medical office for observation. When Nurse Purks called Dr. Mann for instructions, he told her to take no further action, as he would examine Coppage the next day. At that examination, Coppage told Dr. Mann that he had not been able to walk for six days. Records reflect that he also told Dr. Mann that the last time he had urinated any significant amount was five days before and that he had not had a bowel movement for four days. And during the examination, he complained of pain when touched anywhere on his spine, but with inconsistent patterns of tenderness. Dr. Mann noted that his vital signs and deep tendon reflexes were normal. He also performed a Babinski test,[3] and noted a possibly abnormal response from Coppage's right foot. Dr. Mann assessed Coppage's condition as either a psychologically based conversion reaction[4] or a lumbar sacral sprain. To rule out a sprain, he ordered lower back x-rays. Accordingly, Coppage was taken to a radiologist in Fredericksburg, where x-rays were taken. They disclosed nothing abnormal.

Despite the absence of findings, Coppage remained adamant that he was paralyzed from the waist down. Yet, Dr. Mann learned that Coppage was able to move himself during the x-rays and further Coppage told Dr. Mann that his bladder and bowels were functioning normally again. Dr. Mann also noted that Coppage was able to stand up by sliding along the wall, which indicated to Dr. Mann that Coppage still had some strength in his legs and some control over their movement.

The nurses also repeatedly noted what appeared to be voluntary leg movement. Coppage claimed he was experiencing involuntary muscle spasms. Unable to find a physiological cause for Coppage's symptoms and growing increasingly skeptical of his claims, Dr. Mann formulated a diagnosis of conversion reaction.

When Dr. Mann examined Coppage again on July 19, he found no lack of feeling in his back, but did note a positive Babinski response in both feet. Aware that such responses indicated the possibility of a serious neurological condition, Dr. Mann ordered a neurological consult in order to rule out possible compression of the spinal cord. In the nearby City of Fredericksburg, there were two neurologists and one neurosurgeon. Within two hours of Dr. Mann's directive, Nurse Roberts called the office of Dr. Peter Grain, a neurosurgeon, and scheduled an appointment for Coppage for July 21, only two days later. On the morning of the appointment, Dr. Grain called RSC and suggested that it would be more appropriate for Coppage to be examined by a neurologist rather than a neurosurgeon. He recommended Dr. Richard Ranels, who Nurse Purks then called and made an appointment for the morning of July 26, five days later.

From the time of his July 11 collapse until he received a wheelchair a month later, Coppage spent virtually all of his time lying on his mattress or on the floor. Occasionally he was able to walk with the help of nurses, but he typically crawled to the toilet. From the crawling, he developed abrasions on his legs and knees that began to bleed. RSC medical staff cleaned and dressed these abrasions, applying antibiotic ointment and peroxide.

On July 20, Coppage complained of having been unable to urinate for several days and that his bladder was distended. Nurse Fortune installed a catheter, but found his bladder to be dry. Coppage then became inconti-

---

3. A Babinski test is designed to elicit signs of upper motor neuron disease. To perform this test, a physician scratches the outer edge of the sole of the foot and watches the reflex action of the big toe. If the toe bends upwards and the other toes fan when the sole is scratched, the patient is said to have a positive Babinski, which is an *abnormal* reading.

4. According to Dr. Mann, "conversion reaction," also known as "hysterical neurosis," is a neurotic disorder characterized by a wide variety of somatic and mental symptoms. Mann states that of the somatic symptoms, weakness and paralysis of the muscle groups, together with reduced sensitivity to sensation, are classic symptoms.

nent and often urinated or defecated on himself. He was also suffering from diarrhea. When Coppage alerted personnel to this condition, a nurse would change the linens on his bed and assist in cleaning him. Linens were often changed several times a day. Absorbent pads were placed under Coppage, which he could remove and discard in a plastic bag near his bed. Every morning a nurse bathed him and another inmate changed his sheets, collected the trash in his cell, and cleaned and disinfected the toilet and sink area. The nurses implemented a "bowel and urine incontinence program" by encouraging Coppage to establish a regimen in order to "train" his bowel and bladder. Coppage was also provided with a urinal. Nurse Purks claims he simply refused to use it, whereas Coppage says he was physically incapable of using it, often urinating instead into a towel.

Although Dr. Mann stated in his deposition that nurses were on duty seven days per week, twenty-four hours per day, the record reflects that there were periods of time when no nurse was on duty, especially at night. According to Coppage, for more than one-third of the time, no nurse was on site; for almost forty percent of the time, only one nurse was on site, serving approximately 220 inmates. On some occasions, he defecated or urinated in bed at night when no nurse was on duty. When that occurred, Coppage had to lay in his waste until morning. During the day, how long he lay in his waste depended on how busy the nurses were and how many of them were on duty.

On the morning of his neurological examination, Coppage was washed thoroughly with the aid of a nurse. Yet, after being cleaned and while waiting for transportation to Dr. Ranels' office, Coppage involuntarily defecated in his clothing. As a result, he was again cleaned and dressed and Dr. Ranels' office was advised that Coppage would be late. On

the way there, Coppage involuntarily defecated on himself a second time. Not wanting to be later than promised, the guards proceeded to the doctor's office. Once there, the guards advised Nurse Purks that Coppage had soiled himself. She then asked Dr. Ranels' nurse whether a restroom was available to clean Coppage. Nurse Purks was informed that no suitable facility was available. After sitting in the waiting room for almost an hour, Coppage was taken to an examination room and Nurse Purks was summoned to a private meeting with Dr. Ranels. There, she gave Dr. Ranels Coppage's complete medical chart and explained to him that Dr. Mann suspected conversion reaction disorder, but wanted to rule out cord compression and other physical or anatomical causes for the weakness in his legs.

Purks and Dr. Ranels then entered the exam room. It is clear that Dr. Ranels examined Coppage while he sat in his wheelchair, and not on the examination table.[5] For the next half hour, Dr. Ranels examined Coppage, performing several tests and noting various inconsistent sensory and reflex reactions. Dr. Ranels also noted that Coppage could not have been completely paralyzed because he was able to sit in his wheelchair without difficulty and was able to contract his stomach muscles. Nurse Purks also noted that the tendons in Coppage's leg moved in response to stimuli.

When the examination was completed, Dr. Ranels and Nurse Purks returned to Dr. Ranels' office where he gave her a handwritten report and briefed her orally concerning his findings. More specifically, he told her that it was difficult to form an opinion after only one examination and that Dr. Mann should perform two tests that Dr. Ranels had not performed: the cremasteric test and a rectal tone exam.[6] If those tests yielded

5. The reason for leaving Coppage in his wheelchair during the examination is unclear. According to Nurse Purks, the guards prepared to place Coppage on the exam table, but Dr. Ranels told them he could examine him seated in his wheelchair. Dr. Ranels contends, however, that his wife, a member of his office staff, had told him that for some reason Nurse Purks had said that Coppage could not be moved from his

wheelchair and would have to be examined where he sat.

6. In a cremasteric test, the inner thigh is stroked, causing an upward motion of the scrotum in a neurologically healthy person. A rectal exam simply consists of inserting a finger into the rectum to check anal sphincter tone. Where the sphincter is relaxed and unresponsive, the possibility of neurological disease is suggested.

normal results and Coppage's sensory levels remained inconsistent, he would suspect a psychological cause. On the other hand, if the tests results were abnormal or inconsistent, he recommended that Coppage have an MRI or a thoracic bone scan.[7] Dr. Ranels and Nurse Purks are in dispute as to whether Dr. Ranels conveyed any sense of urgency to her with respect to Coppage's condition. It is clear, however, that he did advise Nurse Purks of the possibility that Coppage could have cancer, and it is also clear that she relayed Dr. Ranels' instructions to Dr. Mann.

Three days later, on July 29, Dr. Mann performed the two tests Dr. Ranels had suggested and found a normal response to each. Based on these results and his previous examinations, Dr. Mann diagnosed Coppage's condition as hysterical conversion reaction. He decided to sedate Coppage heavily for twenty-four hours and then explain to him that "when he comes around his brain will have a new start and there may be easy fatigability but strength will come to legs." He repeated the procedure four days later on August 2, but both attempts were unsuccessful.

Meanwhile, by mid-July, Coppage had developed a bedsore on his lower back because he spent so much time lying in bed. Aware of this, the nurses and guards frequently reminded Coppage to shift his position to relieve pressure on the sore. Also, the nurses applied antibiotic ointment to the sore and used blankets and pillows to position Coppage's body to ease the pressure. But Nurse Purks says Coppage belligerently refused to cooperate, throwing the pillows and blankets to the floor. Coppage, for his part, states that he was in too much pain to turn over; lying on his back was the only position that gave him any relief from his pain.

In early August, Nurse Purks decided that Coppage should be transferred from RSC. She was concerned about his health, especially his bedsore, as well as the enormous strain that his care placed on the medical staff. She spoke to Leibowitz and told him she believed Coppage's needs could be met more satisfactorily at a different facility. Leibowitz authorized Nurse Purks to make the appropriate inquiries at other facilities. Pursuant to this authorization, Nurse Purks, on or about August 8, called the secure wing of the Medical College of Virginia. That facility declined to accept Coppage because his sentence was less than three years. Nurse Purks then called Central State Hospital in Petersburg, Virginia, a facility principally engaged in the treatment of the criminally insane. This facility also declined to accept Coppage because they were not equipped to treat his bedsore. She then called the Woodrow Wilson Rehabilitation Hospital in Winchester, Virginia, which told her they could not accommodate prisoners. She apparently made no further efforts in this regard.

On the afternoon of August 9, Dr. Mann, Nurse Purks, Captain Smith, and Leibowitz met in Leibowitz's office. Nurse Purks described the difficulties she and her staff were having in treating Coppage and outlined the efforts she had undertaken to find another facility. Dr. Mann agreed that a transfer of Coppage was appropriate. Leibowitz, it appears, asked Dr. Mann whether they could handle Coppage at RSC. Dr. Mann's precise response is unclear. Leibowitz and Nurse Purks recall that Dr. Mann said they could handle Coppage at RSC. Dr. Mann says he told Leibowitz that since it looked like they had no choice, they at RSC would do the best they could. In any event, Coppage was not transferred from RSC at that time.

Also on August 9, Dr. Mann again examined Coppage and ordered a neurology follow-up with Dr. Ranels with the performance of an electromyogram ("EMG") "to rule out the remote possibility of transverse myelitis." Nurse Purks called Dr. Ranels' office and was told that Dr. Ranels would first require an HIV test to be done. Blood was drawn by a nurse for the test and it was sent to the lab. Mann also ordered a psychiatric consult for Coppage on that day, requesting that Richard Hazlett, a mental health specialist,

---

7. Specifically, Dr. Ranels' handwritten report stated as follows:

Difficult to state absolute on 1 exam. Would check cremasteric and rectal if normal and sensory level not consistent would feel hysterical conversion reaction—if consistent, would consider thoracic bone scan r/o [rule out] a CA [cancer] & MRI thoracic? ...

see and evaluate him. The following day, Hazlett evaluated Coppage and noted that Coppage claimed to be hearing voices. Hazlett's impression was that conversion reaction was a possibility, but not a definitive diagnosis. Hazlett doubted that Coppage could be admitted to the psychiatric unit of RSC unless the diagnosis was definitive and suggested to Dr. Mann that it was necessary to take further steps to rule out physiological causes for Coppage's complaints.

On August 10, because Coppage's bedsore was growing worse, Nurse Purks ordered a hospital bed with an egg crate mattress to help relieve pressure on the sore. She also ordered a wheelchair, and a shower chair for Coppage. The equipment arrived the next afternoon.

Concerned about the worsening bedsore, Nurse Purks and Captain Smith issued a written memorandum to Coppage directing him to change his position every few hours to relieve pressure on the sore. It appears Coppage did not obey the instruction because lying on his back lessened his pain. On August 16, Dr. Mann ordered that if it became necessary, the guards were to turn Coppage every two hours and to hold him in that position with restraints. Restraints were not immediately applied, apparently because Captain Smith did not consider it necessary to do so.

On August 18, RSC received a negative HIV report on Coppage. Accordingly, a nurse called Dr. Ranels to schedule an appointment for the EMG, but was told that his office was closed. She tried again the next day and was told that Dr. Ranels' office would be closed until August 29.

On August 26, noting that Coppage's bedsore had grown worse despite the antibiotic ointment, the egg-crate mattress, the hospital bed, and the orders to Coppage to turn himself, Captain Smith decided to implement Dr. Mann's orders to use restraints on Coppage if necessary. Accordingly, Captain Smith instructed the guards to turn Coppage every two hours and to handcuff him to the bed rail to hold him in that position. The handcuffs were removed to allow Coppage to use the commode, to sit up in his wheelchair, to eat and to visit the recreation yard.

Nurses examined Coppage occasionally to ensure the handcuffs were not too tight. The handcuffs were used in this fashion for about a week to relieve pressure on the bedsore. Then, on September 2, Dr. Mann noticed some improvement in the bedsore and ordered the guards to cease the handcuffing. He also directed Coppage to change positions every hour on his own. When Coppage failed to do so, the handcuffs were used as a remedy occasionally after that, but the record does not reflect how often.

Meanwhile, on August 30, the medical personnel at RSC finally reached Dr. Ranels. Rather than an EMG, Dr. Ranels recommended an MRI of the lumbar sacral spine. Dr. Mann was notified and an MRI was scheduled for September 2 at Mary Washington Hospital, the only facility with an MRI device in Fredericksburg. Mary Washington Hospital called RSC on September 2 and rescheduled the MRI for September 7 due to a malfunction of the MRI machine. Coppage was taken to the hospital for the MRI on September 7. He moved throughout the test, which affected the quality of the images taken, but the radiologist thought it likely a tumor on the spine was present. He recommended another test with Coppage under heavy sedation. Nurse Purks informed Dr. Mann and Leibowitz of the results within an hour. On September 9, Dr. Mann called Dr. Scott, a radiologist at the hospital, and determined that Coppage should undergo a CT scan under heavy sedation. This procedure was scheduled for September 14, the earliest available date for a CT scan under sedation.

Coppage underwent the procedure on September 14. The radiologist who reviewed the results called RSC to advise them that Coppage had a malignant growth in his sacrum that appeared to have been there for a long time. He recommended that Coppage be seen the next day by an oncologist. After advising the sentencing judge, the jail staff secured an order releasing Coppage from custody and he was transferred to Mary Washington Hospital the next day. Coppage was subsequently diagnosed as having a non-Hodgkins lymphoma.

At the hospital, Coppage was not cooperative in receiving treatment for his bedsore. When he entered the hospital, the bedsore was four centimeters by six centimeters; when he left in the spring of 1995, it was twenty centimeters by thirty centimeters and he had developed a second one, as well. He responded well to chemotherapy, however, and in March 1995, he moved to a rehabilitation center for approximately six weeks. In all, Coppage remained in the hospital for approximately six months, accruing a medical bill of over $375,000. He is now a permanent paraplegic, with no use of his legs and no control of his bladder, bowel, or sexual functions.

Coppage claims in this action that these serious and debilitating injuries were proximately caused by defendants' acts and omissions, which acts and omissions, he further claims, violated his rights under 42 U.S.C. § 1983 and the Eighth Amendment to the Constitution (Counts 1–5 of the Complaint), as well as his rights under Virginia law (6–8). In response, defendants claim entitlement to summary judgment on all federal claims and on various state claims.

## II

To establish liability under 42 U.S.C. § 1983, a plaintiff must show that the defendant, acting under color of state law, violated the plaintiff's constitutional rights and thereby caused the plaintiff injury. *See* 42 U.S.C. § 1983. Coppage has alleged that the defendants transgressed his Eighth Amendment right to be free from cruel and unusual punishment by failing to address adequately his medical needs and by subjecting him to inhumane conditions of confinement. The Eighth Amendment's prohibition against cruel and unusual punishment is not limited to the sentences meted out by a court; instead, it is well settled that the Eighth Amendment prohibits "some deprivations that [are] not spe-

cifically part of the sentence but [are] suffered during imprisonment." *Wilson v. Seiter,* 501 U.S. 294, 297, 111 S.Ct. 2321, 2323, 115 L.Ed.2d 271 (1991). And, it is equally well settled that such deprivations may occur in connection with the provision of medical care and other conditions of confinement. *See Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *Rhodes v. Chapman,* 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981).

■ Whether a prisoner alleges inadequate medical care or inhumane conditions of confinement more generally, the analysis is the same. *See Wilson,* 501 U.S. at 299 n. 1, 111 S.Ct. at 2325 n. 1 ("[I]f an individual prisoner is deprived of needed medical treatment, that is a condition of his confinement.") (emphasis omitted). In either case, to establish an Eighth Amendment violation a prison inmate must establish the same two elements: (1) that the alleged deprivation was sufficiently serious and (2) that the defendant acted with "deliberate indifference."[8] *Farmer v. Brennan,* —— U.S. ——, ——, 114 S.Ct. 1970, 1977, 128 L.Ed.2d 811 (1994).

To survive defendants' summary judgment motions, then, Coppage must establish that there is, at the very least, a genuinely disputed issue of a material fact as to each of four elements: (1) that the defendants were "state actors"; (2) that the challenged conduct caused him injury; (3) that his alleged harms were "serious"; and (4) that the defendants acted with deliberate indifference.

Although Coppage must establish each of these elements, the heart of this case involves the fourth; more specifically, summary judgment analysis of his claims requires a determination whether a jury could find that defendants acted with deliberate indifference. Because that standard is central to this case, it merits further elaboration here.

8. The standard applies both to claims alleging poor medical care, *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976), as well as to claims alleging other inhumane conditions of confinement, *Wilson,* 501 U.S. at 302–04, 111 S.Ct. at 2326–27. Eighth Amendment claims involving the excessive use of force are not governed by the deliberate indifference standard. There, the inmate must show that the official acted "maliciously or sadistically to cause harm." *Hudson v. McMillian,* 503 U.S. 1, 7, 112 S.Ct. 995, 999, 117 L.Ed.2d 156 (1992). We need not expand on the meaning of that standard, however, because Coppage has not alleged that the officials here used excessive force.

The Supreme Court has recently made clear that to establish deliberate indifference, an inmate must show that the official "acted or failed to act despite his knowledge of a substantial risk of serious harm" to the inmate. *Farmer,* ___ U.S. at ___, 114 S.Ct. at 1981. *Farmer,* in equating deliberate indifference with criminal recklessness, mandates a subjective inquiry. *Id.* at ___, 114 S.Ct. at 1980. Accordingly, an inmate must do more than show that the official should have known of the risk of harm to the inmate or that a reasonable person would have known of the risk. Rather, an official must himself "know[ ] of and disregard[ ] an excessive risk to inmate health or safety; the official must [himself] be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference." *Id.* at ___, 114 S.Ct. at 1979.

■ Deliberate indifference, may be viewed as a state of mind that lies on a continuum of mind states somewhere between simple negligence and intent to harm.[9] To establish deliberate indifference, it is not necessary to show intent to harm and it is not enough to show negligence.[10] Rather, what must be shown in an Eighth Amendment claim is that the state actor acted or failed to act with the subjective knowledge that her act or failure to act would place the claimant at substantial risk of serious harm. *Farmer,* ___ U.S. at ___, 114 S.Ct. at 1981. The claimant need not show that the state actor knew that harm would result, but only that the state actor subjectively knew that substantial risk of serious harm to claimant would result from her act or failure to act.

■ On the other hand, an inmate need not show that the official acted or failed to act knowing that harm *would* result. It is enough to show that the official knew of a *substantial risk* of harm. Proving knowledge of a substantial risk by direct evidence will often be quite difficult, if not impossible, absent the proverbial smoking gun. As in most cases that require proof of a subjective state of mind, recourse must be made to marshaling the circumstantial evidence. In deciding whether a person acted with deliberate indifference, a jury must consider the totality of the circumstances and decide whether actual knowledge of a substantial risk of harm should be inferred. Thus, although a person will not be held liable under the Eighth Amendment merely because the risk was obvious or because she should have known of the risk to the inmate, obviousness may still be used as evidence of actual knowledge, and "a fact finder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer,* ___ U.S. at ___, 114 S.Ct. at 1981. A jury must not, however, be permitted to speculate; rather, the record must contain evidence from which a reasonable juror could infer a defendant's actual knowledge.

---

9. It is worth emphasizing that deliberate indifference focuses on the actor's state of mind, not on the actor's conduct. At one point, *Farmer* does discuss deliberate indifference in terms of conduct. *See Farmer,* ___ U.S. at ___ ___, 114 S.Ct. at 1982–83 ("[P]rison officials ... may be found free from liability if they responded reasonably to the risk. A prison official's duty under the Eighth Amendment is to ensure 'reasonable safety.' "). But the word "reasonably" in this context has no independent substantive content. What is "reasonable" in the Eighth Amendment context can be defined only by reference to the state-of-mind standard of deliberate indifference. But of course, an actor's conduct may be evidence of the actor's state of mind, for it is well established that a person may be taken to intend the natural and probable consequences of her acts. *See United States v. Bakker,* 925 F.2d 728, 738 (4th Cir.1991).

10. Complaints that amount to charges of mere negligence are clearly insufficient to establish a claim of deliberate indifference. *Estelle,* 429 U.S. at 106, 97 S.Ct. at 292. In the medical context, a negligent misdiagnosis, by itself, cannot constitute the basis of an Eighth Amendment claim. *See Wester v. Jones,* 554 F.2d 1285, 1286 (4th Cir.1977) (negligence in examining an inmate or an incorrect diagnosis does not constitute deliberate indifference). Similarly, courts refuse to entertain Eighth Amendment claims where the inmate is simply disagreeing with the course of treatment chosen by the doctor in his or her medical judgment. *See, e.g., Wright v. Collins,* 766 F.2d 841, 849 (4th Cir.1985). Even a negligent act performed by a person who knew that the act was negligent, that is, knew that the act fell below the relevant professional standard of care, would not necessarily constitute deliberate indifference unless the person also subjectively knew that the act would create a substantial risk of harm to the inmate.

In the following section, each of Coppage's Eighth Amendment claims against each defendant is considered to determine whether he has shown the existence of a triable issue of fact as to each of the required elements.

## III

■ The first of Coppage's claim to be addressed is that he was not provided with adequate medical care while at RSC. His medical claims will be considered against each defendant in turn, but at the outset, it must be noted that he has clearly met the first two requirements as to all defendants. First, each of the defendants were state actors. All defendants save one concede that they were acting under color of state law when performing all acts at issue in the case. Only Dr. Ranels argues to the contrary; he claims that as an outside consulting physician he was not a state actor during the course of his examination of Coppage. This argument, however, was flatly rejected by the Fourth Circuit in *Conner v. Donnelly*, 42 F.3d 220 (4th Cir.1994). There, the court held that a physician who treats an inmate of a state-run prison acts under color of state law even in the absence of a contractual relationship between the prison and the physician. *Conner* is controlling here and Dr. Ranels' invitation to disregard its holding must be rejected. All defendants, including Dr. Ranels, are state actors in the context of this case.

■ Second, Coppage has established that his medical needs were "serious" and thus that the harms he claims he suffered from defendant's medical treatment are of constitutional concern. A medical need is "seri-ous" if it is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention" or if denial of or a delay in treatment causes the inmate "to suffer a life-long handicap or permanent loss." *Monmouth County Correctional Institutional Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir.1987), *cert. denied*, 486 U.S. 1006, 108 S.Ct. 1731, 100 L.Ed.2d 195 (1988); *Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir.1980), *cert. denied*, 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 239 (1981). Both Coppage's neurological problem and his bedsore were recognized by several physicians as mandating treatment. His cancer has permanently paralyzed him from the waist down, and his bedsore has required extensive reconstructive surgery. These harms are clearly serious and are cognizable under the Eighth Amendment.

The claims against each defendant must now be considered separately to determined whether there is a genuine issue of material fact as to the third and fourth required elements.

### 1. Dr. Ranels

■ Beginning with Dr. Ranels, then, the crucial inquiry is whether he acted with deliberate indifference toward Coppage and whether that indifference harmed Coppage.[11] Coppage first argues that Dr. Ranels knew Coppage's condition was serious and required immediate attention, yet did not convey the appropriate "sense of urgency" to Nurse Purks on July 26.[12] That fact alone

**11.** At the threshold, Dr. Ranels assets a blanket causation defense, arguing that no harm flowed from any of his conduct because Coppage's injuries occurred before he saw Coppage on July 26. But Dr. Ranels cannot prevail on this defense at the summary judgment stage because its medical underpinning is hotly disputed. Dr. Ranels presents an expert witness who opines under oath that Coppage was irreversibly damaged before Dr. Ranels examined him. Yet, Coppage's causation expert, also under oath, asserts the opposite; he claims that if "somebody would have done the MRI the date Dr. Ranels saw him, it would have made a tremendous difference to the prognosis of the quality of life for this man." Also, an expert witness for Dr. Mann has testified that Coppage's paralysis was still reversible after the date Dr. Ranels saw him. There is, therefore, a genuine issue of material fact as to whether any act or omission on the part of Dr. Ranels contributed to Coppage's injuries.

**12.** The precise information that Dr. Ranels communicated to Nurse Purks is a matter of some dispute. Dr. Ranels claims that he indicated to Nurse Purks that the patient's condition was serious and there was a need to perform the appropriate tests as quickly as possible. Nurse Purks, on the other hand, contends that Dr. Ranels did nothing more than restate his instructions and concerns that were contained in his handwritten report. The dispute must be resolved in the manner most favorable to Coppage

fails to establish liability because there is no evidence that it caused Coppage any harm. Even if Dr. Ranels had specifically told Nurse Purks that Coppage's condition was extremely urgent, there is no evidence that she and Dr. Mann would have acted any differently, in light of the undisputed fact that Dr. Ranels, in his handwritten report, advised that cancer was a possibility, thereby communicating some urgency and further instructing the RSC medical staff to perform two tests and then to consider an MRI only if the two tests did not yield normal results. As the record reflects, these instructions were carried out reasonably promptly, namely within three days. Given this and the fact that the test results were negative, it is not surprising that the record is bereft of any support for Coppage's claim that he suffered harm from Dr. Ranels' alleged failure to convey a "sense of urgency" to Nurse Purks. This contention, then, fails.

 Coppage also argues that Dr. Ranels was deliberately indifferent in that he chose not to perform the cremasteric and rectal tone examinations himself because Coppage had soiled himself, a contention that is fairly supported by the evidence in the record. It is undisputed, however, that when Dr. Mann performed the tests three days later, he obtained normal results. Again, Coppage has presented no evidence that those results would have been any different had Dr. Ranels performed the two tests on July 26th. Thus Dr. Ranels' failure to do the tests himself was not a proximate cause of injury to Coppage and so cannot be the basis of an Eighth Amendment claim.[13]

 Coppage's third argument is that Dr. Ranels consciously disregarded the risk to Coppage by not ordering an immediate MRI and by instead ordering two tests that

could not rule out cord compression. In this regard, Coppage points out that Dr. Mann sent Coppage to Dr. Ranels for the specific purpose of ruling out cord compression. Yet, Coppage's medical expert testified that although abnormal results of cremasteric and rectal tone tests are indications of spinal cord compression, it is possible for a patient to be suffering from spinal cord compression but nonetheless produce normal results on those two tests. There is no direct evidence as to Dr. Ranels' view of this point, but Dr. Mann's deposition testimony is helpful here. Dr. Mann testified, in agreement with Coppage's expert, that the cremasteric and the rectal tone examinations could not absolutely rule out spinal cord compression. He went on to say, however, that in fact *no* diagnostic tool, even an MRI or CT scan, could absolutely rule out cord compression and that doctors were necessarily dealing with probabilities and possibilities rather than with black-and-white certainties. He did admit that an MRI was a more effective tool in ruling out cord compression than the cremasterics and the rectal tone examinations.

Essentially, then, Coppage's argument is that Dr. Ranels was deliberately indifferent, not in recommending two tests that could not have ruled out cord compression, but in recommending two tests that were *less effective* than an MRI. This does not constitute deliberate indifference. The case law draws a clear distinction between situations in which the physician provides no medical care, which may amount to deliberate indifference, and those in which the physician provides merely substandard care, which amounts at most to negligence.[14] A complaint over the effectiveness of the chosen treatment falls into the latter category. That Dr. Ranels was remiss in not using a more effective diagnostic tool,

and so, for purposes of his claim against Dr. Ranels, Nurse Purks' version is taken as true.

13. That is not to say that those two facts—Dr. Ranels' failure to convey a "sense of urgency" and to perform the two tests—are completely irrelevant. They do constitute circumstantial evidence of Dr. Ranels' state of mind during his examination of Coppage, a point explored more fully hereafter. But because the two acts did not proximately cause any harm, they cannot, by themselves, establish liability.

14. *Compare Sosebee v. Murphy,* 797 F.2d 179 (4th Cir.1986) (summary judgment for defendant improper where the record contained evidence that he was aware of serious condition and refused any medical assistance) *with Williams v. O'Leary,* 55 F.3d 320 (7th Cir.1995) (negligent medical care did not rise to the level of cruel and unusual punishment), *petition for cert. filed,* No. 95–6090 (August 25, 1995).

when the procedure he chose was reasonably capable of identifying the cause of the illness, at most states a claim of medical malpractice.[15] Coppage has not shown that Dr. Ranels' failure to employ the more effective diagnostic tool was deliberately indifferent, especially in light of the other factors that contraindicated cord compression.

Coppage's evidence must, however, be viewed as a whole and his claim that Dr. Ranels should have performed an MRI must be considered in light of the circumstantial evidence discussed above that tends to show that Dr. Ranels was less than conscientious with respect to Coppage. The question, in other words, is whether a reasonable juror could find that Dr. Ranels subjectively knew of a substantial risk of serious harm to Coppage when presented with evidence that Dr. Ranels (1) was negligent in choosing the less effective of two diagnostic tools; (2) failed to convey orally a "sense of urgency" to Nurse Purks, although giving an explicit written report warning of the possibility of cancer and other serious conditions; and (3) did not perform two diagnostic tests himself because he was unwilling to touch a patient who had defecated on himself. In other words, Coppage attempts to promote his claim of negligence to one of deliberate indifference by dressing it up with the pieces of circumstantial evidence of Dr. Ranels' indifference.

To allow the jury to find deliberate indifference from these facts, however, would be to sanction an impermissible degree of speculation. It is true that subjective knowledge may be proved by circumstantial evidence and that "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer*, —— U.S. at ——, 114 S.Ct. at 1981. But Coppage has presented no evidence that the risk resulting from having the cremasterics and rectal tone examinations instead of the MRI was obvious; the record simply does not indicate the relative effectiveness of the MRI versus the two tests.

*Farmer* allows a jury to take the inferential step from the fact that the risk was obvious to the fact that the defendant must have known of the risk. Yet, Coppage would also ask the jury to infer that the risk was obvious. The two inferences are quite different. *Farmer* allows the inference of actual knowledge to be drawn from the obviousness of the risk because it is usually impossible to prove directly a defendant's state of mind. But it *is* possible to prove that a particular risk was objectively obvious and there is therefore less need to permit inferences as to obviousness. In this instance, Coppage has failed to provide evidence that the risk was obvious and has thereby failed to show that there is a triable issue of fact as to the third and fourth elements of his Eighth Amendment claim against Dr. Ranels.

## 2. Dr. Mann

Coppage also asserts an Eighth Amendment claim for deliberately indifferent medical care against Dr. Mann. The discussion of the elements of state action and seriousness of harm above applies to Coppage's medical claims against all defendants. The remaining question to be resolved on summary judgment is whether Dr. Mann consciously disregarded a substantial risk of harm to Coppage.

 Coppage first argues that Dr. Mann was deliberately indifferent in the diagnosis and treatment of what was in fact his developing cancer. In this regard, it is appropriate to consider when Dr. Mann first became aware of a substantial risk to Coppage and then to consider whether he demonstrated deliberate indifference in the face of that risk. On July 11, Coppage fell in his cell and had to be brought to the hospital on a stretcher. When Dr. Mann examined him the next day, Coppage claimed that he was paralyzed from the waist down, that his back was numb, and that he had been unable to walk for six days. He also said he had been

---

**15.** Coppage has proffered expert testimony to the effect that Dr. Ranels was negligent in not ordering an MRI on July 26. But an expert opinion that a doctor made an error in his or her medical judgment is insufficient to establish an Eighth Amendment claim. *Cf. Wright v. Collins*, 766 F.2d 841, 849 (4th Cir.1985) ("Disagreements between an inmate and a physician over the inmate's proper medical care do not state a § 1983 claim unless exceptional circumstances are alleged.").

**1040**

unable to urinate for more than four days and Dr. Mann noted a possibly abnormal Babinski in one foot, an indication of a potentially serious neurological condition. Other tests, such as checking deep tendon reflexes, were inconsistent with Coppage's claims of paralysis. Dr. Mann was also aware of Nurse Purks' notes that after Coppage was taken to the hospital on the stretcher, she noted what appeared to be voluntary leg movements. In light of these inconsistencies and Coppage's pattern over several months of complaining of inexplicable pains, Dr. Mann assessed Coppage's condition as either conversion reaction disorder or a lumbar sacral sprain. To rule out the latter, he sent Coppage out of RSC for an x-ray, which revealed no abnormalities.

■ It does not appear that Dr. Mann consciously disregarded a substantial risk of serious harm to Coppage on July 12. Certainly, paralysis and incontinence are signs of a serious condition. But Dr. Mann found evidence that there was in fact no paralysis, and considering his experience with Coppage's previous complaints,[16] he had reason to view these new complaints with some skepticism. In any event, Dr. Mann performed an examination, which disclosed no abnormalities, sent Coppage out for x-rays, which also showed nothing abnormal, and given these results, then reached a reasonable, albeit incorrect, diagnosis. On the basis of this evidence, a reasonable juror could not find that Dr. Mann knew that his course of treatment created a substantial risk of serious harm to Coppage. Neither a misdiagnosis alone nor a disagreement with a doctor's chosen course of medical treatment makes out a claim of deliberate indifference. *See Wester v. Jones*, 554 F.2d 1285, 1286 (4th Cir.1977) (incorrect diagnosis does not constitute deliberate indifference); *Wright v. Col-*

*lins*, 766 F.2d 841, 849 (4th Cir.1985) (disagreement over treatment plan does not constitute deliberate indifference).

When Dr. Mann examined Coppage again on July 19, he found positive Babinski's in both feet and then ordered a neurological consult in order to rule out compression of Coppage's spinal cord. He arranged for Coppage to see a neurologist two days later. That neurologist canceled the appointment at the last moment and it was arranged for Coppage to see Dr. Ranels five days later. Dr. Ranels' recommendation to Dr. Mann was to perform two tests; if the tests yielded normal results and Coppage's pattern of tenderness across his back remained inconsistent, then Dr. Ranels said he would agree that Coppage's condition was psychologically based. Dr. Mann performed the tests and found normal results. Moreover, Coppage's tenderness remained inconsistent. Thus, Dr. Mann, acting on the advice of Dr. Ranels, the specialist, continued to diagnose Coppage as suffering from conversion reaction. Dr. Mann's reliance on the specialist was perfectly reasonable and negates a conscious disregard for Coppage's health.[17]

Dr. Mann thereafter acted on the belief that Coppage's condition was psychological, but noticed no improvement. Accordingly, on August 9, he ordered Coppage to return to Dr. Ranels for an EMG to "rule out [the] remote possibility of transverse myelitis." A nurse called Dr. Ranels' office and was told that Coppage must first have an HIV test. The blood sample was sent to the laboratory that afternoon and the results came back negative on August 18. On that day a nurse called Dr. Ranels to schedule an appointment and was told that his office was closed until August 29. She called again on August 30, at which time Dr. Ranels told her that Cop-

---

**16.** Coppage had previously complained of pain and numbness in various parts of his body, as well as a burning sensation while urinating, shortness of breath, and blood in his stool. Yet the RSC medical staff was unable to verify the symptoms or identify a physiological cause for them. In one instance early on, Coppage was observed playing basketball shortly after having complained of paralysis and numbness in his legs.

**17.** Coppage points out that Dr. Mann sent Coppage to Dr. Ranels to rule out cord compression, yet Dr. Mann admitted in his deposition that he knew that the tests would not definitively rule out the possibility of cord compression. But as discussed above with respect to Dr. Ranels, the issue is how effective those tests were in ruling it out. The argument that Dr. Mann was remiss in relying too heavily on those test results is an attack on his medical judgment and therefore states only a claim of medical negligence.

page should first receive an MRI. The nurse then called Mary Washington Hospital and scheduled an MRI for September 2. On that morning, the hospital called to say that the MRI was malfunctioning and rescheduled the test for September 7. On that day, Coppage received the test and doctors then, for the first time, discovered his cancer.

The relevant question then is whether the delay of almost one month in receiving more neurological tests would, in the circumstances of this case, warrant a jury in finding deliberate indifference. In this connection, Dr. Mann admits that although he was not personally involved in scheduling the tests or appointments with Dr. Ranels, he was aware during that month that Coppage still had not undergone any further neurological testing. Courts have held that an unusually long delay between the emergence of a serious medical need and treatment of that need may provide a reasonable basis for an inference of deliberate indifference. *See Loe v. Armistead,* 582 F.2d 1291, 1296 (4th Cir.1978), *cert. denied,* 446 U.S. 928, 100 S.Ct. 1865, 64 L.Ed.2d 281 (1980). But the evidence here is insufficient for a juror to reach the conclusion that Dr. Mann "knew of a substantial risk" to Coppage. The evidence shows, at most, that while continuing to act on the diagnosis of conversion reaction disorder, Dr. Mann recognized the presence of a slight risk of transverse myelitis and he thought it prudent, in his medical judgment, to eliminate that risk. There is no evidence, however, that he thought the risk was substantial. On the contrary, his own word at the time was "remote." He continued to believe that Coppage was suffering from a psychological disorder and was arranging for a psychiatric examination. Nothing in the record points to the conclusion that Dr. Mann subjectively knew of a substantial risk. Indeed, for a juror to reach such a conclusion would require an impermissibly speculative inferential leap, one that a reasonable juror could not make on the basis of this record.

This conclusion is in accord with the cases in which delay in providing medical treatment forms the basis of a deliberate indifference claim. These cases establish that "[d]elay in access to medical attention can violate the Eighth Amendment when it is tantamount to unnecessary and wanton infliction of pain." *Hill v. Dekalb Regional Youth Detention Center,* 40 F.3d 1176, 1187 (11th Cir.1994) (citing *Estelle,* 429 U.S. at 104–05, 97 S.Ct. at 291–92) (inner quotations and citations omitted). Further, all the cases that discuss delay as a basis for a deliberate indifference claim "concerned medical needs that are obvious even to a layperson because they involve life-threatening conditions or situations where it is apparent that delay would detrimentally exacerbate the medical problem." *Hill,* 40 F.3d at 1187; *see, e.g., Cooper v. Dyke,* 814 F.2d 941 (4th Cir.1987) (delay in caring for detainee known to have a gunshot wound); *Sosebee,* 797 F.2d at 182 (delay when it was "obvious that [plaintiff] required immediate medical attention during this time period"); *Loe,* 582 F.2d at 1296 (delay in treating detainee with an obviously broken arm). In sum, the cases are just one step short of the clear case of deliberate indifference where an official simply *refuses* to provide medical attention known to be necessary. In all of those cases, the risk to the inmate is obvious and clearly substantial. Coppage's situation, however, falls well short of those cases because his need for an MRI in the month of August was not obvious. Coppage cites no case, and none has been found, in which a claim of deliberate indifference was permitted to rest on a delay in obtaining a particular test when the doctor was continuing to provide what he thought was sufficient treatment in the interim.

Coppage's second argument is that Dr. Mann was deliberately indifferent in failing to transfer him to another facility. Dr. Mann admits that he concurred with Nurse Purks' recommendation in early August that Coppage be transferred. But he claims that he understood that it was impossible to transfer Coppage. Coppage has presented evidence that Dr. Mann may have been aware of possible alternative facilities. He first points to the April discharge document from Mary Washington Hospital, which ordered him to return if he showed signs of paralysis or incontinence. Coppage claims that this served as an "invitation" for admittance to the hospital. The document, however, refers to returning to the emergency

room to be examined further and not to returning for admission to the hospital. Dr. Mann does not deny that he could have returned Coppage to the emergency room; the issue, however, is whether Coppage could have been admitted to the hospital. Second, Coppage points to Supplement L of the RSC Medical Department Operations Manual which states that an inmate may be admitted to Mary Washington Hospital. Dr. Mann, however, claims to have been ignorant of this provision and Coppage does not proffer evidence disputing his lack of knowledge. An expert on behalf of Coppage stated that "[h]ad Dr. Mann read the manual he would have been aware of the availability of Mary Washington Hospital for Coppage as an inmate requiring hospital care." There is no evidence, however, that Dr. Mann did read the manual [18] and the expert's testimony at most provides a basis for a negligence claim. Finally, Coppage points out that Dr. Mann was aware that Coppage could have been presented at the emergency room of Mary Washington and that there was a chance that the doctors there would choose to admit Coppage as an in-patient. Dr. Mann claims that he did not do so because the doctors there would simply have called Dr. Ranels in for a consultation, and he thought it appropriate to send Coppage to Dr. Ranels directly. This again is a choice that Dr. Mann made in exercising his medical judgment. Had Dr. Mann chosen not to present Coppage to the emergency room, nor to do anything further at all, that might rise to the level of a conscious disregard of Coppage's serious medical needs. But that is not what occurred. On the very day that transfer was discussed, Dr. Mann ordered another neurological consult with Dr. Ranels, an EMG, a psychiatric consult, and continued treatment for Coppage's bedsore. Coppage's claim is essentially that Dr. Mann made the wrong choice. Such claims do not amount to deliberate indifference. *See Wright,* 766 F.2d at 849.

### 3. *Nurse Purks*

Next, Coppage alleges Eight Amendment violations by Nurse Purks. His first argument is that she was deliberately

indifferent in failing to pass along Dr. Ranels' urgent assessment of Coppage's condition to Dr. Mann. But there is no evidence that her failure to pass on to Dr. Mann all of what Dr. Ranels told her thereby caused Coppage any harm. Dr. Mann was independently aware that Coppage's condition was potentially quite serious. In his handwritten report to Dr. Mann, Dr. Ranels referred to the possibility of cancer and transverse myelitis, both of which are indisputably serious conditions. Moreover, Dr. Mann carried out Dr. Ranels specific instructions and concluded, on the basis of the specialist's report, that Coppage's problems were psychological rather than physiological. There is no reason to believe that he would have acted any differently had Nurse Purks additionally stated to him that Dr. Ranels believed Coppage's case to be urgent.

Coppage also argues that Nurse Purks was deliberately indifferent in failing to advise Leibowitz of the need to transfer Coppage to Mary Washington Hospital. There is undisputed evidence that Nurse Purks expressed her concerns to Leibowitz that RSC was incapable of adequately caring for Coppage and by doing so, she obtained Leibowitz's permission to explore the possibility of transfer. It is also undisputed that she placed three phone calls on or about August 8 in an attempt to transfer Coppage to another facility. On August 9, a meeting was held with Nurse Purks, Dr. Mann, and Leibowitz to discuss Coppage. There is some dispute as to whether Nurse Purks voiced her concerns about Coppage at that meeting, but it is clear that the issue of transfer was discussed at the meeting. While it is true she did not transfer Coppage herself, she offers expert testimony, uncontradicted by Coppage, that it is the prerogative of the jail doctor, Dr. Mann, and not the head nurse, to determine whether an inmate should be transferred. She also offers uncontradicted evidence that she lacked the authority to order Coppage's transfer. In light of the steps she took to raise her concerns about RSC's ability to treat Coppage and to investigate other facilities and in light of her limited ability to effect the transfer,

---

**18.** It does not appear that any of the defendants read the manual or were aware of this option.

there is simply no basis for a jury to infer deliberate indifference on her part. Coppage has pointed to no action she could have taken to effect a transfer, nor has he established that she failed to do so knowing she placed Coppage at risk. He has therefore failed to show a material issue of triable fact on the third and fourth elements of an Eighth Amendment claim against Nurse Purks.

### 4. *Superintendent Leibowitz*

■ Finally, Coppage alleges claims of inadequate medical care against Leibowitz. Supervisors of those who commit constitutional torts may be held liable under section 1983, although not on the basis of *respondeat superior*. Rather, Coppage must show that Leibowitz's "corrective inaction amounts to deliberate indifference or tacit authorization of the offensive practices." *Miltier v. Beorn*, 896 F.2d 848, 854 (4th Cir.1990) (inner quotations and citations omitted). Leibowitz cannot be held liable for the medical decisions made by his staff unless he independently demonstrated deliberate indifference. In this regard, Leibowitz claims, and the record supports, that he provided Dr. Mann with whatever assistance for Coppage that Dr. Mann deemed appropriate in the way of outside medical consults and tests and Coppage does not appear to dispute this. Just as in *Miltier*, "everything in the record suggests that the warden[ ] closely monitored [Coppage's] health and ensured that [he] received medical treatment." *Id.* But Coppage contends that in spite of this, Leibowitz demonstrated deliberate indifference because he knew from Dr. Mann and Nurse Purks that Coppage should be transferred yet he did not do so. Leibowitz responds that Dr. Mann told him that they could care for Coppage at RSC and that he is entitled to rely on the professional judgment of his medical staff. *See Miltier*, 896 F.2d at 854 (affirming summary judgment dismissal of Eighth Amendment claims against supervisory prison official, stating that the wardens were entitled to rely on the expertise of the prison medical staff). It is therefore necessary to pay careful attention to precisely what the staff told Leibowitz.

It is not disputed that Leibowitz knew that Nurse Purks believed that Coppage should be transferred, both because of his medical condition and the strain that he placed on the medical resources of RSC. At the meeting on August 9, Leibowitz asked Dr. Mann and Nurse Purks, "Have you tried to transfer [Coppage] to some facility?" Nurse Purks said that she had, but had not been successful. Leibowitz then asked Dr. Mann whether RSC could handle Coppage. There is a dispute as to precisely what Dr. Mann said in response. Leibowitz's recollection of the discussion is the account most favorable to Coppage. In this regard, Leibowitz recalls that Dr. Mann answered that:

> [H]aving tried and failed to transfer him to another facility and having tried to have him seen at the ER and hopefully ER would do something and having sent him to Dr. Ranels ... that we have no other choice and we have to continue here and at the same time press all the avenues that are available to us to try and arrive at a resolution of this case.

*Miltier* teaches, and common sense confirms, that Leibowitz's reliance on this advice cannot amount to deliberate indifference. *See Miltier*, 896 F.2d at 854–55.

Yet Coppage argues that Leibowitz cannot avoid liability because Mann's statement was not a wholehearted endorsement of RSC's ability to treat Coppage and that Leibowitz had, and knew that he had, the authority to effect a transfer himself. Coppage claims that Leibowitz knew of the possibility of sending Coppage to Mary Washington Hospital because of the April discharge notice. This statement, however, was included in a medical document which there is no reason to believe that Leibowitz ever saw, and Coppage offers no evidence that Leibowitz was personally aware of the document. In any event, the document refers to returning to the emergency room for follow-up treatment, not necessarily for in-patient care.

Coppage also points to Section L of the RSC Medical Department Operations Manual,[19] which states that "in-patient hospital

---

**19.** At Leibowitz's deposition, defense counsel ob-

jected to references to this manual as being irrel-

care [at Mary Washington Hospital] is available to inmates requiring hospital care." Leibowitz's deposition testimony is unclear as to whether he had read that provision in the manual. But the Foreword to the Manual is signed by Leibowitz and states, "It is ... mandatory that all personnel be familiar with the policies set forth...." and a juror could reasonably conclude that Leibowitz did have actual knowledge of that provision. Yet, that fact alone cannot establish Eighth Amendment liability because it does not appear that Leibowitz himself had the authority to admit Coppage to Mary Washington Hospital. Even plaintiff's expert agreed that the hospital admission of patients is exclusively a physician's prerogative, in general, doctors admit patients to hospitals. Nor is there any evidence in the record that Leibowitz held some exceptional authority to admit a prisoner to the Mary Washington Hospital. Thus, Coppage has not shown the existence of a triable issue of fact as to Leibowitz's deliberate indifference.[20]

### IV

In addition to his Eighth Amendment claims for inadequate medical treatment, Coppage also claims that the conditions in which he was confined were inhumane and therefore constituted cruel and unusual punishment. Coppage claims that Dr. Mann, Nurse Purks, and Leibowitz caused him to lie in his waste for hours at a time, that for a month he spent almost all of his time either lying on the floor or on his bed because he was unable to walk and was not provided with a wheelchair, and that he was cruelly handcuffed to his bed. As discussed above in Part II, the same analysis applies to both claims of inadequate medical treatment and claims challenging conditions of confinement.

See Wilson, 501 U.S. at 301–05, 111 S.Ct. at 2325–28. Thus, to defeat summary judgment, Coppage must show that there is at least a genuine issue of material fact as to the same four elements. The conclusion, reached previously, that each defendant was acting under color of state law at all times relevant to this case applies equally to the conditions of confinement claim. Coppage must therefore produce evidence that each of the defendants acted with deliberate indifference to his conditions of confinement, that the acts proximately caused him injury, and that the harm was sufficiently serious as to amount to a constitutional violation. Each of his claims is considered in turn.

Coppage's claim against each of the defendants regarding his having to lie in feces and urine must fail. Defendants do not dispute that Coppage did in fact lie in this disgusting condition for a period of time.[21] But neither does Coppage dispute that he was cleaned and his sheets were changed several times each day during the period of his incontinence, that absorbent pads were placed underneath him, that a bowel and bladder incontinence program was implemented—in short, that the medical staff used their best efforts to cope with his incontinence. Indeed, there seems to be little more that the staff could have done to handle Coppage's incontinence, except perhaps to wash and clean him more frequently. In essence, then, Coppage's claim is one of timely aid. He claims that because RSC was short-staffed with nurses, he was forced to lie in squalor for long periods of time.

These contentions plainly do not make out a claim against Nurse Purks. Coppage admits that she was doing the best she could and there is no indication that she was re-

---

evant in a § 1983 action. Although it is true that mere noncompliance with internal standards is insufficient to make out an Eighth Amendment claim, those internal regulations may nonetheless be relevant as to what options the defendant thought were available and therefore whether he was deliberately indifferent to the risk.

20. Coppage also points to the Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 U.S.C. § 1395dd, for the duty of any hospital to treat a patient who appears requiring emergency care. That statute provides for emer-

gency care and is not necessarily a means by which any patient can be admitted to any hospital. Also, Coppage does not argue that any of the defendants knew of the provisions in that Act. EMTALA is simply irrelevant here.

21. The parties dispute the length of these periods. Defendants contend that Coppage was never left lying in waste for more than an hour or two, whereas Coppage contends that he often lay all night long in waste. For purposes of this motion, Coppage's version is accepted as true.

sponsible for the number of nurses on duty. It is therefore difficult to identify an act or omission on her part that she knew would pose a substantial risk of harm to Coppage. Similarly, Coppage does not contend that the lack of nurses was the fault of Dr. Mann, and has offered no other evidence that would show that Dr. Mann acted with conscious disregard to the conditions in Coppage's cell.[22] Presumably, as RSC's supervisor, Leibowitz would have been responsible for hiring a sufficient number of nurses. But Coppage does not even provide specific evidence of that fact, let alone evidence that Leibowitz failed to hire more nurses knowing that as a result Coppage would be placed at a substantial risk of living in inhumane conditions.

The claim regarding denial of a wheelchair also fails. Coppage claims not have been able to walk starting on July 11; Nurse Purks ordered a wheelchair for him on August 10 and it arrived the following day. Although a one-month delay in providing a wheelchair to an inmate who was unable to walk might state an Eighth Amendment claim, Coppage has simply not provided any evidence as to the defendants' states of mind. Without proffering specific evidence that each of the defendants knew that not providing Coppage with a wheelchair placed him at a substantial risk of harm, Coppage cannot reach the jury on that claim.

The remaining Eighth Amendment claim concerns the defendants' decision to handcuff Coppage to his bed. In considering whether a particular use of restraints violates the Eighth Amendment, the first consideration is whether its purported purpose was to punish the inmate. Here, it is undisputed that Coppage was handcuffed to his bed, not to punish him, but to relieve the pressure on his bedsore. Even so, the "mere characterization of an act or conditions as 'treatment' does not insulate it and the circumstances that surround it from eighth

amendment scrutiny." *Wells v. Franzen,* 777 F.2d 1258, 1264 (7th Cir.1985). In cases where restraints were used to treat or protect the inmate, courts have considered the circumstances surrounding the challenged measure, its duration, the object to be served, and the degree of supervision and attention by medical personnel to ensure that their use comports with the Eighth Amendment. *See LeMaire v. Maass,* 12 F.3d 1444, 1460 (9th Cir.1993); *Ferola v. Moran,* 622 F.Supp. 814, 820 (D.R.I.1985); *cf. Stewart v. Rhodes,* 473 F.Supp. 1185 (S.D. Ohio 1979), *appeal dismissed,* 661 F.2d 934 (6th Cir. 1981), *aff'd,* 785 F.2d 310 (1986). In this case, it is clear that the handcuffs were used only as a last resort. Before resorting to handcuffs, the medical staff (i) cleaned the wound daily, (ii) applied ointment, (iii) tried to relieve pressure by propping Coppage up with pillows and blankets, (iv) provided him with an egg crate mattress, and (v) lectured him repeatedly on the need to shift his weight. None of these measures was successful. Only then did Captain Smith resort to handcuffs, which were then used continuously for just one week and only sporadically after that. Moreover, it appears Coppage was handcuffed for two hours at a time and then released often to use the toilet, to eat, to sit in his wheelchair, and to visit the recreation yard. Also, he was closely monitored by nurses and guards while he was restrained. Even Coppage's own treating physician and expert witness testified that a bedsore should be treated by turning the patient, that restraints are an appropriate form of treatment if the patient is unwilling or unable to turn himself, and that he himself has used restraints in the treatment of bedsores. All of this belies the contention that the defendants' use of handcuffs on Coppage amounted to punishment. Rather, defendants were faced with a serious medical condition for which one aspect of the accepted treatment modality, namely turning the pa-

22. Dr. Mann contends that he cannot be liable for a prison conditions claim because he is an independent contract physician and is not responsible for establishing the conditions of confinement. He contends that all conditions-of-confinement claims have been brought against wardens and prison administrators. *See, e.g.,*

*Wilson v. Seiter,* 501 U.S. 294, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991); *Strickler v. Waters,* 989 F.2d 1375 (4th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 393, 126 L.Ed.2d 341 (1993). Because Coppage's claim against Dr. Mann must be dismissed for failing to establish deliberate indifference, this contention need not be addressed.

tient periodically, could not be implemented because Coppage would not cooperate. In these extreme circumstances, defendants resorted to using restraints, and in so doing it is clear that "they responded reasonably to the risk" that Coppage's bedsore posed. *Farmer,* — U.S. at — — —, 114 S.Ct. at 1982–83.[23] In sum, federal courts in considering Eighth Amendment claims of this sort are limited to considering whether the medical treatment afforded state prisoners amounts to punishment, and "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot ... be condemned as the infliction of punishment." *Farmer,* — U.S. at —, 114 S.Ct. at 1979.

All of Coppage's § 1983 claims must therefore be dismissed. That is not to say that defendants deserve praise or commendation for the care they provided Coppage during his incarceration. And nothing in this opinion or ruling should be construed as doing so. To conclude, as here, that defendants did not commit constitutional torts, did not subject Coppage to cruel and unusual punishment, and were not deliberately indifferent to his serious medical needs does not mean that Coppage was provided with medical treatment that complied with the reasonable standard of care. It does not mean that the state fulfilled its obligation to Coppage to provide him with competent medical care. Indeed, if Coppage's proffered facts and experts' opinions are credited, the state fell far short of doing so. Nor is the state entitled to provide substandard care to inmates simply because they are inmates. Most citizens would find wholly unacceptable the quality of care Coppage claims he was given during his incarceration at RSC. Thus, if Coppage's factual allegations and experts' opinions are credited, the Commonwealth of Virginia might well find it useful to review medical care at RSC and perhaps elsewhere to ensure that inmates in the state's prisons are receiving competent, timely, and appropriate medical care.

## V

■ Dr. Mann, Nurse Purks, and Leibowitz argue that even if Coppage has made out a claim for an Eighth Amendment violation, they are protected from liability by the doctrine of qualified immunity. It is undisputed that, as ordinary government officials, these three defendants are protected by a qualified, but not an absolute, immunity. *See Procunier v. Navarette,* 434 U.S. 555, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978). In addressing the contours of a qualified immunity defense, the Supreme Court in *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) held that government actors are immune from suit if their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known" at the time of the conduct. *Id.* at 818, 102 S.Ct. at 2738. Coppage's right to be free from deliberately indifferent treatment by state actors is certainly a clearly established right. *See Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). Yet, not so clear is the application of that general clearly established right to the specific circumstances of this case. Indeed, the complexity and detail required in the analysis of Coppage's Eighth Amendment claims amply demonstrates that the specific right in this case was far from clear, and, consequently, Dr. Mann, Nurse Purks, and Superintendent Leibowitz are immune from liability in this case even if Coppage's Eighth Amendment claims were to survive summary judgment.

## VI

■ In addition to the Eighth Amendment claims, Coppage also alleges pendent state law claims of medical malpractice against Dr. Ranels, Dr. Mann, and Nurse Purks, and claims of intentional infliction of emotional distress and assault and battery against Dr. Mann, Nurse Purks, and Superintendent Leibowitz. Having dismissed all of

---

**23.** Coppage offers expert testimony that the use of handcuffs was extreme and outrageous. But the expert seemed to be under the mistaken impression that the handcuffs were somehow being used to treat Coppage's cancer and not his bedsore. *See* Cohen Dep. at 86 ("To use handcuffs as a supposed treatment for cancer seemed to me bizarre and dangerous and cruel."). This expert's opinion is therefore irrelevant.

Coppage's federal claims, it remains to be considered whether his remaining pendent state-law claims may be dismissed as well, pursuant to 28 U.S.C. § 1367(c)(3). The state-law claims present no novel or complex issue of state law such that the principle of comity would counsel a dismissal without prejudice in favor of a state-court resolution. Moreover, this case is now far along on the road to final disposition; the parties have completed discovery and are prepared to proceed immediately to trial. In a sense, we are at least in the seventh inning in this contest and in these circumstances there is little to be gained by declining to adjudicate the state claims. As this Court has noted recently in similar circumstances, "dismissal here would disserve the goals of judicial economy, convenience, and fairness, since the parties have already [completed] discovery, and the Court is already familiar with the facts of the case." *Williams v. The 5300 Columbia Pike Corp.*, 891 F.Supp. 1169, 1182 (E.D.Va.1995). Jurisdiction over the remaining state-law claims will be retained.

### VII

Dr. Mann, Nurse Purks, and Superintendent Leibowitz have moved for summary judgment on all three state-law claims on the grounds that they are protected from liability by the doctrine of sovereign immunity, the application of which raises no genuine issue of material fact.[24]

The doctrine of sovereign immunity protects the state from liability for claims of negligence asserted against it. The presumption at common law was that a sovereign cannot be sued in its own courts in order to protect the public purse and to preserve the orderly administration of government by protecting the state from bur-

densome interference with the performance of its governmental functions. *Messina v. Burden*, 228 Va. 301, 321 S.E.2d 657, 660–61 (1984). In addition, the doctrine is retained in the recognition that "without sovereign immunity public service might be threatened because citizens might be reluctant to take public jobs [and] without the doctrine there would exist inconvenience and danger to the public in the form of officials being fearful and unwilling to carry out their public duties." *Id.*, 321 S.E.2d at 660.

Because a state acts through its employees, the sovereign immunity doctrine extends to public employees as well. Although Virginia has statutorily waived its immunity from negligence suits against the Commonwealth itself, it has explicitly retained "the individual immunity of ... public officers, their agents and employees from tort claims for damages...." Va.Code § 8.01–195.3. Yet, only negligent conduct is protected by the doctrine; acts constituting gross negligence or intentional torts are not immunized. *Fox v. Deese*, 234 Va. 412, 362 S.E.2d 699 (1987); *James v. Jane*, 221 Va. 43, 282 S.E.2d 864, 869 (1980). Coppage's claims against Dr. Mann, Nurse Purks, and Superintendent Leibowitz of intentional infliction of emotional distress and assault and battery are intentional torts, and thus are not barred by the doctrine. The only claims the doctrine might bar, then, are the malpractice claims against Nurse Purks and Dr. Mann. Even then, those defendants are protected from liability only for their acts of ordinary negligence.

In deciding whether a person is entitled to the protection of sovereign immunity with respect to negligent conduct, Virginia courts consider four factors: "(1) the nature of the

---

24. Originally, only Nurse Purks and Leibowitz sought summary judgment on the state-law claims. Dr. Mann later filed a supplemental motion in which he moved for summary judgment on the pendent claims as well, "adopting" the brief of co-defendants Purks and Leibowitz. Coppage objects to the motion as untimely in that it violates the scheduling order. Dr. Mann's motion is nonetheless entertained here despite its untimeliness because the defense of sovereign immunity would inevitably arise at trial on a motion for judgment as a matter of law pursuant

to Rule 50, Fed.R.Civ.P., given that this defense can only be waived by express statutory language, a circumstance not present here. *See Virginia Bd. of Medicine v. Virginia Physical Therapy Ass'n*, 13 Va.App. 458, 413 S.E.2d 59 (1991), *aff'd*, 245 Va. 125, 427 S.E.2d 183 (1993).

Also, Dr. Ranels has not sought summary judgment on the medical malpractice claim, the only state-law claim against him. His suggestion that this court decline to exercise supplemental jurisdiction over that claim has been rejected.

function performed by the employee; (2) the extent of the state's interest and involvement in the function; (3) the degree of control and direction exercised by the state over the employee; and (4) whether the act complained of involved the use of judgment and discretion." *Messina,* 321 S.E.2d at 663 (citing *James,* 282 S.E.2d 864). It is these principles that must now be applied to the claims against Dr. Mann and Nurse Purks. Instructive in this regard is *Lohr v. Larsen,* 246 Va. 81, 431 S.E.2d 642 (1993), where the Supreme Court of Virginia held that a state-employed public health physician was entitled to sovereign immunity from liability for acts of ordinary negligence. There, the court found sufficient state involvement and control in that the doctor could neither choose his patients nor set his fees. The court also noted that the function the doctor was performing was essential to a governmental objective. It was evident that the Commonwealth had a strong interest in providing quality medical care to its citizens through the clinic and had found it necessary to use skilled physicians to do so. Finally, the court found that the doctor was using his judgment and discretion in treating patients rather than performing purely ministerial acts.

The case at bar is essentially identical. The Commonwealth has a strong interest in providing inmates in its custody with adequate medical care; in fact, it is obligated to do so by the Constitution. To accomplish this goal, the Commonwealth has properly found it necessary to provide a trained medical staff at the prisons. And in so doing, the Commonwealth's involvement and control is evident from the fact that Nurse Purks and Dr. Mann are accountable to the State Board of Corrections, their salaries are paid in part by the state, and they have no choice as to the patients they see. In addition, in treating Coppage, Nurse Purks and Dr. Mann were exercising their judgment and discretion in determining how best to address Coppage's health problems. Like the physician in *Lohr,* they are therefore immune from liability for acts of ordinary negligence.[25]

## VIII

Because sovereign immunity only shields defendants from liability for acts of ordinary negligence, Nurse Purks and Dr. Mann remain liable for acts of gross negligence. The question, then, is whether Coppage can show gross negligence with respect to either of those defendants.

Gross negligence has been defined as the "absence of slight diligence, or the want even of scant care." *Frazier v. City of Norfolk,* 234 Va. 388, 362 S.E.2d 688, 691 (1987). It is that "degree of negligence as should shock fair-minded men although something less than willful recklessness." *Laster v. Tatum,* 206 Va. 804, 146 S.E.2d 231 (1966). Although the term is difficult to define apart from the context of specific facts, *Young v. Dyer,* 161 Va. 434, 170 S.E. 737 (1933), it is apparent that it is closely related to, if not identical to, civil recklessness. *Accord Farmer,* — U.S. at — n. 4, 114 S.Ct. at 1978 n. 4 (stating that "gross negligence," although a nebulous term, in practice essentially means civil recklessness). Coppage argues that Nurse Purks was negligent in failing to pass along Dr. Ranels' critical assessment of Coppage to Dr. Mann. But as discussed above in the context of the Eighth Amendment claims, there is no evidence that any such failure on her part was a proximate cause of injury to Coppage in light of the clear instructions from Dr. Ranels to Dr. Mann. This cannot be the basis even for a negligence claim, let alone one for gross

---

25. Coppage cites *James v. Jane,* 221 Va. 43, 282 S.E.2d 864 (1980) in arguing that sovereign immunity does not apply here. In that case, the court denied immunity to two doctors on the staff at the Medical School of the University of Virginia. There, however, the doctors "were under no obligation to accept any individual as a patient." *Lohr,* 431 S.E.2d at 644 (inner quotation omitted). Also, they had some flexibility in charging their patients for their services and "the allegedly negligent acts there were not undertaken in furtherance of the Commonwealth's interest in providing medical education." *Id.* Dr. Mann and Nurse Purks, on the other hand, had no flexibility either in terms of the patients they saw or any billing arrangements, and their actions were directly in furtherance of the Commonwealth's interest in providing medical services to its inmates. The case at bar therefore more closely resembles *Lohr,* which specifically distinguished *James. See id.* at 644.

negligence. Coppage also contends that she should have demanded that he be transferred and has produced expert testimony that she violated the standard of care by failing to do so. Nurse Purks, on the other hand, offers expert testimony that she did everything in her power to provide reasonable treatment to Coppage and that she lacked the authority to effect a transfer. There is no indication, however, that she acted recklessly, or that she should have known that harm would result. By raising her concerns to Dr. Mann and Leibowitz and by making some efforts to bring about a transfer, she exercised more than slight diligence. In sum, Coppage's allegations against Nurse Purks amount at most to negligence and hence are barred by the sovereign immunity doctrine.

Coppage's claims against Dr. Mann stand on a different footing. Specifically, he has presented expert testimony that Dr. Mann fell below the applicable professional standard of care in diagnosing Coppage's condition as conversion reaction, in failing to order an MRI on July 12, in failing to transfer Coppage to another facility, and, after finding the need for further neurological testing, allowing a month to pass before Coppage received an MRI. Unlike deliberate indifference, gross negligence does not require a juror to find that Dr. Mann subjectively knew of a substantial risk; it is enough that Dr. Mann should have been aware of that risk. A reasonable juror could conclude that Dr. Mann should have known that it was highly possible that Coppage was suffering from compression of the spinal cord rather than conversion reaction disorder, in light of the unremedied incontinence and paralysis. In addition, a juror is permitted to take into account the fact that the consequences of a misdiagnosis in this case were extreme. That is, an action that is taken in the face of a risk of slight harm might be reasonable; but the same action taken in the face of a risk of extreme harm might be negligent or even grossly negligent. Accordingly, a reasonable juror could find Dr. Mann's actions to have been grossly negligent and Dr. Mann's motion for summary judgment on the medical malpractice claim must therefore be denied.

## IX

Coppage's claim under Virginia law for intentional infliction of emotional distress is unaffected by the sovereign immunity doctrine. To establish such his claim, Coppage must show (1) intentional or reckless conduct by the wrongdoer; (2) outrageous and intolerable conduct that offends against the generally accepted standards of decency and morality; (3) a causal link between the conduct and the emotional distress; and (4) severe emotional distress. *Womack v. Eldridge,* 215 Va. 338, 210 S.E.2d 145 (1974). The Supreme Court of Virginia has made it clear, however, that this tort "is 'not favored' in the law" and that "the court should allow no recovery in a doubtful case." *Ruth v. Fletcher,* 237 Va. 366, 377 S.E.2d 412, 415, 416 (1989).

Coppage's claim fails to establish the second element, that the conduct was sufficiently outrageous. Although Coppage alleges outrageous conduct, when viewed in light of all the facts in the record, the defendants' conduct does not rise to the level of conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Russo v. White,* 241 Va. 23, 400 S.E.2d 160, 162 (1991). With respect to his medical care, the staff may well have delayed in treating Coppage or misdiagnosed him, but they did provide him with some level of care, including examining him in the jail, sending him out for x-rays and an MRI, and sending him to a neurologist and a mental health specialist. His allegations may amount to charges of medical malpractice, but mere professional negligence is not sufficiently extreme and outrageous to give rise to this unfavored tort. *Cf. Timms v. Rosenblum,* 713 F.Supp. 948 (E.D.Va.1989), *aff'd* 900 F.2d 256 (4th Cir.1990). As to the handcuffing, the undisputed evidence indicates that it was done as a last resort to treat his bedsore, that it may well have helped treat the sore, that he was restrained for only two hours at a time, that he was monitored while restrained, and that he was released to use the toilet, sit in his wheelchair, and to go to the recreation yard. Given these facts, the

handcuffing was not outrageous and that claim fails. The claim concerning having to lie in his waste also fails in light of the fact that he was periodically cleaned, that his linens were changed, and that he admits that the staff did their best to cope with his incontinence.

## X

Coppage also claims that the defendants committed the intentional torts of assault and battery by handcuffing him to his bed without any legitimate penological or medical justification. To be liable for assault or battery, defendants must be shown to have intended, through wantonness, malice, or anger, to cause harmful or offensive contact to Coppage. *See Paramont Mining Corp. v. NLRB,* 631 F.2d 346 (4th Cir.1980); *Crosswhite v. Barnes,* 139 Va. 471, 124 S.E. 242 (1924). It is undisputed, however, that defendants handcuffed Coppage in order to treat his bedsore, and that such treatment, although extreme, was necessary to prevent the worsening of the sore. This claim fails.

## XI

In sum, the motions for summary judgment by Nurse Purks and Leibowitz are granted, the motion of Dr. Ranels is granted with respect to Count 1—the Eighth Amendment claim—and the motion of Dr. Mann is granted with respect to Counts 1, 2, and 5—the Eighth Amendment claims—as well as Counts 7 and 8—the claims of intentional torts—but denied as to the medical malpractice claim insofar as Coppage can establish gross negligence on the part of Dr. Mann. Coppage's claim of gross negligence against Dr. Mann and his malpractice claim against Dr. Ranels survive summary judgment. An appropriate order will issue.